# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

METAVANTE CORPORATION,

        Plaintiff,

    v.                                    Case No. 05-CV-1221

EMIGRANT SAVINGS BANK,

        Defendant.

_____

# ORDER

On July 25, 2006, plaintiff Metavante Corporation ("Metavante") filed its second amended complaint against Emigrant Savings Bank ("Emigrant") alleging that Emigrant had breached a written agreement between the parties. Metavante seeks a declaration of its right to payments made under the agreement, and to a termination fee. (Second Am. Compl., Docket #79). On August 18, 2006, Emigrant answered Metavante's complaint and asserted counterclaims of breach of contract, fraud in the inducement, intentional misrepresentation, rescission, negligent misrepresentation, negligence, recklessness and breach of fiduciary duty. (Am. Answer & Countercl., Docket #84). On April 27, 2007, the court dismissed Emigrant's rescission, negligent misrepresentation, negligence and recklessness claims for failing to state claims upon which relief could be granted. Metavante now moves for summary judgment on Emigrant's remaining counterclaims of breach of contract, fraud in the inducement, intentional misrepresentation and breach of fiduciary duty.

## BACKGROUND

In early 2004, Emigrant, a bank incorporated in New York, decided to open an Internet direct bank. (Def.'s Proposed Findings of Fact ("DPFF") ¶ 10). A direct bank is a "virtual bank" providing traditional banking services and products such as savings accounts and certificates of deposit to customers over the Internet. (DPFF ¶ 6). Around that same time, Metavante, a Wisconsin-based provider of outsourcing services and technology products to financial institutions, began marketing its products and services to Emigrant. (DPFF ¶¶ 1, 20). Over the first half of 2004, the parties negotiated a deal that would foster the creation of Emigrant's online direct bank, which came to be known as EmigrantDirect. (DPFF ¶¶ 24). On August 6, 2004, the parties executed a written document entitled Technology Outsourcing Agreement (the "Agreement"). (Pl.'s Proposed Findings of Fact ("PPFF") ¶ 5, Docket #383).

The Agreement provided for an implementation period during which the parties would develop a platform for the EmigrantDirect project. (Hileman Decl. Ex. C, ¶ 4, Docket #334). Under the Agreement, Metavante was to provide its electronic banking services, as well as its Automated Clearing House ("ACH") services to process account transactions on EmigrantDirect. (Hileman Decl. Ex. C, ¶¶ 4.5, 4.6). In return, Emigrant was to pay Metavante certain fees. The Agreement had an initial term of five years, although the exact date on which the term was to commence is not clear from the face of the document. (Hileman Decl. Ex. C, Docket #334). What is clear is that the Agreement terminated well before the expiration of the initial term.

Case 2:05-cv-01221-JPS   Filed 11/26/08   Page 2 of 37   Document 426

On January 5, 2005, EmigrantDirect opened its virtual doors to the Internet banking public. (PPFF ¶ 16). The parties do not dispute that the volume of transactions generated through EmigrantDirect was greater than anticipated, and the system soon began to experience technical performance issues. (PPFF ¶ 17; DPFF ¶ 83). Initially, Emigrant was particularly concerned with the system's lack of overdraft protection, which would have prevented EmigrantDirect customers from withdrawing more than the amount deposited in their accounts. (PPFF ¶¶ 19-21). Although the overdraft issue was addressed, troubles with the EmigrantDirect system apparently did not end there. While the parties dispute the exact nature, extent and root causes of the system errors suffered by EmigrantDirect, the parties do not dispute that system errors occurred. (DPFF ¶¶ 87-92, 95-98). At some point in the first several months of EmigrantDirect's launch, Emigrant stopped paying Metavante fees as they accrued under the Agreement. (Notice of Removal, Docket #1).

In September, 2005, Metavante filed a summons and complaint in Milwaukee County Circuit Court alleging Emigrant had breached the Agreement by failing to pay fees as they became due. On November 10, 2005, Emigrant's general counsel sent a letter notifying Metavante of its desire to terminate the Agreement and move EmigrantDirect off the Metavante system. (PPFF ¶ 23; DPFF ¶ 101). Emigrant also requested termination assistance from Metavante as provided for under the Agreement. (PPFF ¶ 23; DPFF ¶¶ 102, 104-06). Days later, Metavante sent Emigrant its own notice of termination, citing Emigrant's failure to pay fees as

Case 2:05-cv-01221-JPS   Filed 11/26/08   Page 3 of 37   Document 426

grounds for termination. (DPFF ¶ 103). On November 22, 2005, Emigrant filed a notice of removal to the United States District Court for the Eastern District of Wisconsin, invoking the court's diversity jurisdiction. While the parties have not provided the court with a precise time line of correspondence, Metavante's amended complaint alleges that around this same time Emigrant sent a check to Metavante for at least a portion of the past-due fees. (Am. Compl. ¶ 15, Docket #8). Over the next several months, the parties continued to discuss termination of the Agreement. Eventually, the parties agreed to deconvert EmigrantDirect from Metavante's system, although the process was not complete until July of 2006. (DPFF ¶ 107). On July 25, 2006, Metavante amended its complaint to include a breach of contract claim alleging that Emigrant had breached a side agreement entered into by the parties in April 2006.

## ANALYSIS

Summary judgment is appropriate where the moving party establishes that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those facts that "might affect the outcome of the suit," and a dispute about a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial."

*Celotex*, 477 U.S. at 256-57. A party opposing summary judgment must set forth specific facts showing the existence of a genuine issue for trial, and may not rely on allegations or denials of the adverse party's pleading. Fed.R.Civ.P. 56(e). In conducting its review, the court views all facts and draws all reasonable inferences in favor of the nonmoving party. *See Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006).

As an initial matter, because the parties come before the court based on their diversity of citizenship, the court is obliged to look to Wisconsin law to resolve substantive questions of law. *See Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Much of Metavante's motion depends on competing interpretations of the Agreement. The Agreement stipulates that Wisconsin law shall govern its interpretation. (Hileman Decl., Ex. C, § 17.1, Docket #334). The parties do not dispute that Wisconsin law should apply. Although choice of law provisions are not necessarily conclusive, the court will look to Wisconsin law in considering the terms of the Agreement. *See generally Love v. Blue Cross and Blue Shield of Georgia, Inc.*, 439 F.Supp.2d 891, 892-94 (E.D.Wis. 2006) (discussing choice of law rules).

Under Wisconsin law, the general purpose of contract interpretation is to determine the intent of the parties. *See FPL Energy Point Beach, LLC v. Energy Resources of Australia Ltd.*, 565 F.Supp.2d 999, 1004 (W.D.Wis. 2008) (citation omitted). Whenever possible, terms of a contract should be given their ordinary or plain meaning. *See id.* Therefore, when the contract language is unambiguous,

Case 2:05-cv-01221-JPS   Filed 11/26/08   Page 5 of 37   Document 426

"determining the parties' intent ends with the four corners of the contract." *Id.* (quoting *Huml v. Vlazny*, 716 N.W.2d 807, 820 (Wis. 2006)).

**1.    Monetary Damages**

Metavante first argues that it is entitled to summary judgment on Emigrant's counterclaims because Emigrant seeks money damages barred by the terms of the Agreement.  Specifically, Metavante asserts that the Agreement limits liability for consequential and punitive damages, and bars any recovery for tort claims. Metavante also asserts that Emigrant's counterclaims are barred because the Agreement specifically sets maximum damages, and because the Agreement limits liability for Metavante's processing and reporting errors, problems with the ACH services, and problems encountered by Emigrant's customers.  Finally, Metavante argues that Emigrant's counterclaims are barred because Emigrant did not give Metavante an opportunity to cure defects before seeking damages.  The court addresses each of Metavante's contentions in turn.

## A.    Consequential Damages

First, Metavante alleges that Emigrant's counterclaims seek consequential damages, which are prohibited by the Agreement.  Metavante claims that Emigrant's claims for loss of goodwill, injury to reputation, lost employee hours, and loss of potential depositors are essentially claims for consequential damages.  Section 9.2 of the Agreement reads as follows:

> Exclusion of Incidental and Consequential Damages. . . NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY . . . IN CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, FOR INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES OF ANY KIND– including lost profits, loss of business, or other economic damage, and further including injury to property, AS A RESULT OF BREACH OF ANY WARRANTY OR OTHER TERM OF THIS AGREEMENT, INCLUDING ANY FAILURE OF PERFORMANCE, REGARDLESS OF WHETHER THE PARTY LIABLE OR ALLEGEDLY LIABLE WAS ADVISED, HAD OTHER REASON TO KNOW, OR IN FACT KNEW OF THE POSSIBILITY THEREOF.

(Hileman Decl., Ex. C, § 9.2, Docket #334).  Metavante also notes the Agreement's definition of the term "damages" explicitly excludes consequential damages. (Hileman Decl., Ex. C, § 18(L), Docket #334).  Emigrant responds that these provisions do not limit damages for claims alleging reckless or intentional conduct, and to the extent they do limit such damages, they are unenforceable as against public policy.  Emigrant argues that its fraud and intentional misrepresentation claims allege intentional and reckless conduct, and, therefore, it may recover consequential damages on those claims.

On its face, section 9.2 of the Agreement purports to bar recovery of consequential damages, and does not contain any proviso for claims alleging reckless or intentional conduct. Emigrant does not dispute that it seeks consequential damages. Rather, Emigrant attempts to paint section 9.2 of the Agreement as an exculpatory clause that should be strictly construed to exclude claims arising from a party's reckless or intentional conduct. Emigrant directs the court to several Wisconsin Supreme Court cases. *See e.g.*, *Atkins v. Swimwest Family Fitness Ctr.*, 691 N.W.2d 334, 338 (Wis. 2005) (refusing to enforce written release signed by minor at swimming pool purporting to waive all liability regardless of fault); *Cange v. Stotler and Co., Inc.*, 826 F.2d 581, 592 (7th Cir. 1987) (construing strictly exculpatory clauses relieving principals from liability for damages caused by their agents); *RepublicBank Dallas, N.A. v. First Wisconsin Nat'l Bank of Milwaukee*, 636 F.Supp. 1470, 1473 (E.D.Wis. 1986) (holding that under Wisconsin law exculpatory clauses are unenforceable where intentional or reckless conduct is alleged). Emigrant also cites the court's previous order in this case, in which the court stated:

> In cases addressing liability waivers and damages limitations, the Wisconsin Supreme Court has determined that waivers and damages limitations in contracts are valid and enforceable when they specifically indicate what types of claims are being waived and do not seek to waive claims based on intentionally or recklessly wrongful conduct.

(Order, April 27, 2007, 10-11, Docket #115) (Internal citations omitted).

Metavante replies to Emigrant's argument by directing the court to the Wisconsin Supreme Court's decision in *Rainbow Country Rental and Retail, Inc. v.*

-8-

*Ameritech Publ'g, Inc.*, 706 N.W.2d 170 (Wis. 2005). In that case, the supreme court distinguished between an exculpatory clause, which relieves a party from liability, and a stipulated damages clause, which merely limits recoverable damages. *See id.* at 102. The supreme court held that a stipulated damages clause is valid and enforceable if it is reasonable, which depends on the following factors:

> (1) whether the parties intended to provide for damages or for a penalty; (2) whether the injury caused by the breach would be difficult or incapable of accurate estimation at the time of entering into the contract; and (3) whether the stipulated damages are a reasonable forecast of the harm caused by the breach.

*Id.* at 103.

Here, there can be little doubt the parties intended to provide for damages. The Agreement includes an entire section entitled "LIMITATION OF LIABILITY/MAXIMUM DAMAGES ALLOWED," which provides for multiple liability contingencies. (Hileman Decl., Ex. C, § 9, Docket #334). From this section, it appears that the parties drafted the Agreement to strike a balance between providing each party some recourse in the event of a breach, while attempting to avoid the inherent difficulties in calculating lost profits and other consequential damages. The agreement even contemplates greater liability in the case of willful or intentional conduct. (Hileman Decl., Ex. C, § 9.3, Docket #334). The court finds that section 9.2 is a reasonable stipulated damages clause that bars recovery of consequential damages on Emigrant's counterclaims. Hence, the court grants Metavante's motion for summary judgment and dismisses Emigrant's counterclaims to the extent Emigrant seeks consequential damages.

## B.    Punitive Damages

Metavante also alleges that Emigrant's claim for punitive damages is also barred under the terms of the Agreement.  Metavante again cites section 9.2 and the definition of "damages" in the Agreement, both of which explicitly bar punitive damages.  While tort claims may provide a "broader array" of damages than contract claims, punitive damages are generally not available for breach of contract claims and only sometimes available in tort claims.  *See Grams v. Milk Products, Inc.*, 699 N.W.2d 167, 171 (Wis. 2005).  Moreover, Emigrant has not disputed Metavante's claim that it is not entitled to punitive damages under the Agreement.  Therefore, the court grants this portion of Metavante's motion, and dismisses Emigrant's counterclaims to the extent they seek punitive damages.

## C.    Tort Claim Waiver

Metavante next asserts that yet another provision in the Agreement waives the parties rights to recover any damages under tort theories:

> Tort Claim Waiver. In addition to and not in limitation of any other provision of this Article 9, each party hereby knowingly, voluntarily, and intentionally waives any right to recover from the other party. . . any economic losses or damages in any action brought under tort theories, including, misrepresentation, negligence and/or strict liability, and/or relating to the quality or performance of any products or services provided by Metavante. For purposes of this waiver, economic losses and damages include monetary losses or damages caused by a defective product or service except personal injury or damage to other tangible property. Even if remedies provided under this Agreement shall be deemed to have failed of their essential purpose, neither party shall have any liability to the other party under tort theories for economic losses or damages.

(Hileman Decl., Ex. C, § 9.5, Docket #334). Emigrant argues this section is an exculpatory clause that the court should read strictly to exclude claims based on intentional or reckless conduct. Indeed, this section could be read broadly to include claims based on reckless and intentional conduct. However, the court declines to interpret section 9.5 in such an expansive manner. In its April 27, 2007 order, the court found that section 9.5 was not invalid on public policy grounds, but noted that exculpatory clauses are strictly construed under Wisconsin law. (Order, April 27, 2007, 8-12, Docket #115). The court also noted that section 9.5 "does not attempt to disclaim liability for intentional or reckless conduct of either party." *Id.* The court reaffirms this conclusion, and finds that section 9.5 does not apply to Emigrant's fraud in the inducement or intentional misrepresentation claims.[1] Therefore, any purported limitations on damages contained in section 9.5 do not apply to Emigrant's tort claims alleging intentional or reckless conduct.

### D. Maximum Damages Provision

Metavante next argues that Emigrant's counterclaims seek damages above and beyond the maximum damages allowed under the Agreement. Section 9.3 of the Agreement states:

> <u>Maximum Damages Allowed</u>. Notwithstanding any other provision of this Agreement, and for any reason, including breach of any duty imposed by this Agreement or independent of this Agreement, and regardless of any claim in contract, tort (including negligence) or otherwise, Metavante's total, aggregate liability under this Agreement, shall in no circumstance exceed payments made to Metavante by Customer for the Services during the six (6) months prior to the act or

---

[1]The court addresses Emigrant's breach of fiduciary duty claim later in this opinion.

event giving rise to such claim. No such limitation shall apply with respect to Metavante's willful misconduct or intentional failure to perform.

(Hileman Decl., Ex. C, § 9.3, Docket #334). Metavante claims that Emigrant has used an expert to calculate damages beyond the limitations of this section of the Agreement. Emigrant responds that this section applies only to claims arising under the agreement and excludes claims based on willful or intentional conduct. The court does not consider section 9.3 to be a bar against Emigrant's possible recovery on its counterclaims. While this provision likely applies to Emigrant's breach of contract claim, it does not apply to Emigrant's fraud in the inducement and intentional misrepresentation claims. Therefore, without more information on the exact damages sought by Emigrant on its counterclaims, the court is not in a position at this juncture to decide whether section 9.3 of the Agreement would limit Emigrant's potential recovery.

### E.    Other Provisions Limiting Damages

Metavante asserts that the Agreement bars Emigrant from recovering damages for Metavante's processing errors, inaccurate reports, problems with ACH services, and problems encountered by EmigrantDirect customers. First, Metavante argues that the Agreement limits Emigrant's remedies for processing and reporting errors to notifying Metavante of such errors and allowing Metavante to remedy the errors. Metavante cites section 16.3 of the Agreement, which states:

Balancing and Controls. Customer shall (a) on a daily basis, review all input and output, controls, reports, and documentation, to ensure the integrity of data processed by Metavante, and (b) on a daily

-12-

basis, check exception reports to verify that all file maintenance entries and non-dollar transactions were correctly entered. Customer shall be responsible to notify Metavante immediately in the event of any error so that Metavante may initiate timely remedial action to correct any improperly processed data which these reviews disclose. In the event of any error by Metavante in processing any data or preparing any report or file, Metavante's sole responsibility, and Customer's sole remedy, shall be to correct the error by reprocessing the affected data or preparing and issuing a new file or report at no additional cost to Customer.

(Hileman Decl., Ex. C, § 16.3, Docket #334). Metavante argues that this section prohibits recovery of damages for processing and reporting errors, and cites ten specific allegations in Emigrant's counterclaims involving processing errors or reports. (Supp. Br. 10-11, Docket #332). Emigrant responds that the allegations Metavante references are evidence of the fundamental inadequacies of Metavante's system, and that section 16.3 was meant only for errors that Metavante could immediately correct.

The court finds that section 16.3 does not bar Emigrant's ability to recover damages on its counterclaims. Section 16.3 appears to be aimed at allocating the duties of both parties in reconciling any processing and reporting errors that the parties anticipated. Emigrant's counterclaims are not seeking recovery for any specific processing or reporting errors. Rather, Emigrant alleges Metavante failed to perform its duties under the contract in a commercially reasonable manner. The frequency and causes of any processing and reporting errors is merely evidence relevant to proving or disproving Emigrant's counterclaims.

Next, Metavante argues that a provision in the Agreement referencing ACH services similarly bars liability for Metavante's ACH errors. Like section 16.3, section 4.6(C) provides that "Metavante's liability to Customer for claims arising out of the ACH Services performed by Metavante pursuant to this Agreement shall be limited to the processing of appropriate corrected ACH entry(ies)." (Hileman Decl., Ex. C, § 4.6(C), Docket #334). Metavante again cites Emigrant's counterclaims in which Emigrant alleges Metavante's fax line failed to receive Emigrant's report of erroneous ACH transactions, which delayed the corrections of those errors. Emigrant responds that its claims do not arise from faulty ACH transactions alone, and, therefore, this clause does not apply. The court agrees with Emigrant that section 4.6(C) does not bar Emigrant from recovering damages on any of its counterclaims. Metavante cannot use section 4.6(C) of the Agreement as a shield against liability when Emigrant alleges Metavante failed to provide a means, i.e., a working fax machine, through which to reconcile ACH transactions in accordance with section 4.6.

Metavante also argues that Emigrant is barred from recovering damages based on allegations that Emigrant's customers experienced problems with EmigrantDirect. To support its contention, Metavante directs the court to an indemnification clause in the Agreement relating to "End Users" of banking services on EmigrantDirect:

> End User Agreements. Customer shall be solely responsible for contracting with, and managing relationship with, End Users of the Electronic Banking Services and for obtaining all necessary End User

-14-

authorizations and consents. Metavante will not have a contractual relationship with End Users, and so must rely upon Customer to manage liability and risk issues. Customer will include appropriate provisions in its End User agreements regarding, and shall indemnify Metavante against, defend Metavante against, and hold Metavante harmless from claims arising from: (a) any End User's use of or inability to use the Electronic Banking Services, specifically including, without limitation, any End User's claim for economic loss or damages arising from the End User's use of the Internet Banking Services; (b) transactions effected with a lost, stolen, counterfeit or misused access code or identification number issued by Customer to any End User. . . .

(Hileman Decl., Ex. C, § 4.5(B), Docket #334). This provision states its purpose clearly: To manage liability and risk issues relating to the end users of EmigrantDirect. The indemnity provision seeks to protect Metavante from losses or injury suffered by end users. The court finds that section 4.5(B) does not apply to Emigrant's counterclaims. Emigrant is seeking damages for its own injuries allegedly caused by Metavante, and is not seeking to recover any damages that may have accrued to customers of EmigrantDirect.

## F.    Opportunity to Cure

Metavante also asserts that Emigrant cannot recover money damages because Emigrant failed to provide Metavante an opportunity to cure the alleged defects in Metavante's performance. Metavante cites section 8.2 of the Agreement, which governs termination and default:

For Cause. If either party fails to perform any of its material obligations under this Agreement (a "Default") and does not cure such Default in accordance with this Section, then the non-defaulting party may, by giving notice to the other party, terminate this Agreement as of the date specified in such notice of termination, or such later date agreed to by the parties, and/or recover damages. A party may terminate the Agreement in accordance with the foregoing if such party provides

-15-

> written notice to the defaulting party and either (a) the defaulting party does not cure the Default within thirty (30) days, or (b) if the Default is not capable of cure within thirty (30) days, the defaulting party does not both (I) implement a plan to cure the Default within thirty (30) days of receipt of notice of the Default, and (ii) diligently carry-out the plan in accordance with its terms. . . .

(Hileman Decl., Ex. C, § 8.2, Docket #334). Metavante asserts that allowing a breaching party an opportunity to cure under this provision is a condition precedent to recovery of damages under the Agreement. Metavante argues that Emigrant is barred from recovering damages for a breach of the Agreement because Emigrant did not provide Metavante an opportunity to cure the alleged defaults. Emigrant argues that section 8.2 provides the grounds for terminating the Agreement for cause, and does not affect the parties' ability to sue for damages. The court finds that section 8.2 of the Agreement governs the parties' ability to terminate the Agreement for cause. Section 8.2 does not place a condition precedent on either party's ability to sue the other party for damages. Rather, section 8.2 affirms that either party does not give up its right to sue for damages by terminating the Agreement for cause. The court finds no basis to read into the Agreement the inverse proposition that by not terminating the Agreement for cause, a party gives up its right to sue for damages.

## 2.    Fraud in the Inducement and Intentional Misrepresentation

Metavante moves for summary judgment on Emigrant's fraud in the inducement and intentional misrepresentation claims on five principal grounds. First, Metavante asserts that these claims are time-barred by the Agreement's one year

limitations period. Second, Metavante argues that these claims are barred by the economic loss doctrine. Third, Metavante claims that Emigrant cannot prove the reliance element. Fourth, Metavante argues that Emigrant cannot seek rescission of the Agreement because Emigrant waived that right. And fifth, Metavante claims that Emigrant has no misrepresentation claim based on a representation that Metavante's system would be similar to competitors. The court addresses each of Metavante's contentions below.

## A.    Statute of Limitations

Metavante asserts that Emigrant's fraud and intentional misrepresentation claims are barred by the Agreement's statute of limitations provision. Section 9.4 of the Agreement states the following:

> Statute of Limitations. No lawsuit or other action may be brought by either party hereto, or on any claim or controversy based upon or arising in any way out of this Agreement, after one (1) year from the date on which the cause of action arose regardless of the nature of the claim or form of action, whether in contract, tort (including negligence), or otherwise; provided, however, the foregoing limitation shall not apply to the collection of any amounts due Metavante under this agreement.

(Hileman Decl., Ex. C, § 9.4, Docket #334). Metavante asserts that under Wisconsin law, claims of fraud and misrepresentation accrue when a party discovers facts constituting the alleged fraud. (Supp. Br. 17) (citing Wis. Stat. Ann. § 893.93(1)(b) (2007)). Metavante notes that Emigrant alleges EmigrantDirect began to experience problems shortly after its launch on January 5, 2005. Emigrant first asserted its counterclaims of fraud in the inducement and intentional misrepresentation in its amended answer filed August 18, 2006. (Am. Answer & Countercl., Docket #84).

Metavante argues that since Emigrant discovered possible misrepresentation and fraud over one year before its amended answer, the limitations period ran before Emigrant asserted those counterclaims.   Emigrant responds that the Agreement's limitations period does not apply, and that the period  was tolled when Metavante filed its original breach of contract claim on September 19, 2005. (Opp'n Br. 23, Docket #378) (citing Wis. Stat. Ann. § 893.14).

The parties do not dispute the validity of section 9.4 of the Agreement. Wisconsin law permits parties to a contract to reasonably limit the time for bringing lawsuits on the contract to a shorter period than prescribed by statute.  *See Chilcote v. Blue Cross & Blue Shield United of Wisconsin*, 841 F.Supp. 877, 879-80 (E.D.Wis 1993).  Section 9.4 appears to create a one year statute of limitations for all claims "arising in any way out of" the Agreement, which would presumably include Emigrant's counterclaims of fraud in the inducement and intentional misrepresentation.  The Agreement, however, does not define when a cause of action arises.  Metavante asks the court to use the statutory definition of when a cause of action for fraud accrues.  *See* Wis. Stat. 893.93(1)(b). Yet, Metavante asks the court to ignore another provision within the same section of that statute that tolls the statute of limitations for counterclaims when a plaintiff commences an action in which those counterclaims are made.  *See* Wis. Stat. 893.14.

The court declines to selectively apply the statute in this way.  The court finds that section 9.4 of the Agreement, to the extent it applies to Emigrant's counterclaims, does not bar Emigrant from obtaining relief.  While section 9.4

-18-

applies to Emigrant's claims of fraud in the inducement and intentional misrepresentation, the court is not convinced the one year period ran before Emigrant asserted its counterclaims. Rather, the court considers the period to have tolled upon the commencement of Metavante's breach of contract claim in September of 2005. *See generally Asset Allocation and Management Co. v. Western Employers Ins. Co.*, 892 F.2d 566, 571 (7th Cir. 1989) (noting authority supporting the proposition "that the filing of a claim tolls the statute of limitations on any compulsory counterclaim, by analogy to the "relation back" language of Rule 15"). Even if the one year limitations period had not tolled, the court is not convinced that the evidence, when viewed in a light most favorable to Emigrant, establishes Emigrant's counterclaims accrued over one year before Emigrant asserted its counterclaims in August of 2006.[2] Therefore, the court finds that Emigrant's claims of fraud in the inducement and intentional misrepresentation are not barred by section 9.4 of the Agreement.

**B.    Economic Loss Doctrine**

Metavante also asserts that the economic loss doctrine prevents Emigrant from asserting tort claims when the true dispute involves the parties' performance under the Agreement. Emigrant responds that the economic loss doctrine does not apply to contracts for services and, therefore, the Agreement is not subject to the

---

[2] For example, it was not until November 23, 2005, that Emigrant's chairman wrote in an email to Metavante that "my lawyers inform me that based on their review we have a good fraud case." (PPFF ¶ 22, Docket #383).

doctrine. Both parties cite the same Wisconsin Supreme Court case, *Ins. Co. of N. Am. v. Cease Elec. Inc.*, 688 N.W.2d 462 (Wis. 2004), in support of their arguments.

The economic loss doctrine is a judicially created rule preventing the purchaser of a product from seeking economic damages in a tort claim against the product's manufacturer. *See 1325 N. Van Buren, LLC v. T-3 Group, Ltd.*, 716 N.W.2d 822, 831 (Wis. 2006) (citations omitted). Economic damages generally result from delivery of an inferior product. *See id.* The doctrine is based on the principle that commercial parties are free to allocate risks of economic loss through contract, rather than tort. *See id.* In *Cease Electric*, the Wisconsin Supreme Court held that the economic loss doctrine does not apply to contracts for services. *See* 688 N.W.2d at 464. However, where a contract provides for both products and services, the economic loss doctrine applies where the contract is predominately one for products. *See 325 N. Van Buren, LLC*, 716 N.W.2d at 832 (citation omitted).

The court finds that the Agreement is predominately a contract for services, and, therefore, the economic loss doctrine does not apply. The Agreement mainly provides for Metavante's processing of transactions for EmigrantDirect's banking customers, which is a service. *See e.g.*, *Blackhawk State Bank v. Fiserv, Inc.*, 2006 WI App 56, ¶¶ 21-22 (holding economic loss doctrine inapplicable to contract for check processing services). Any software products provided by Metavante under the Agreement were only licensed to Emigrant on a limited basis and only to the extent it provided a platform for Metavante's services. (Hileman Decl., Ex. C, § 3.4, Docket #334). Therefore, the court finds that the economic loss doctrine does not

bar Emigrant's counterclaims of fraud in the inducement or intentional misrepresentation.

## C.   Justifiable Reliance

Metavante asserts that Emigrant's claims of fraud in the inducement and intentional misrepresentation also fail because Emigrant cannot prove that it justifiably or reasonably relied on Metavante's representations prior to entering into the Agreement.   Specifically, Metavante argues Emigrant could not rely on representations made before the Agreement was signed because the Agreement states no promises or representations had been made outside of the Agreement, and because Emigrant received warnings that the terms of the Agreement were risky.  Emigrant responds that the Agreement's integration clause does not refer to representations, and that any question of whether Emigrant's entering into the Agreement in spite of warnings raises issues of fact.

To state a cause of action for intentional misrepresentation, a plaintiff must show the following:

> (1) the defendant made a representation of fact; (2) the representation was untrue; (3) the defendant made the representation either knowing that it was untrue, or recklessly not caring whether it was true or false; (4) the defendant made the representation with the intent to deceive the plaintiff in order to induce the plaintiff to act on it to plaintiff's pecuniary damage; and (5) the plaintiff believed that the representation was true and relied on it.

*Malzewski v. Rapkin*, 723 N.W.2d 156, 162 (Wis.App.Ct. 2006) (citations omitted).

Fraud in the inducement requires all the elements of intentional misrepresentation with the additional element that the misrepresentation occurred prior to formation of

Case 2:05-cv-01221-JPS   Filed 11/26/08   Page 21 of 37   Document 426

a contract. *See id.* at 164. Metavante attacks the element requiring Emigrant show it believed an untrue representation to be true and relied on it.

First, Metavante claims that the Agreement states no representations were made other than those contained in the Agreement. The court finds this assertion inaccurate. The section of the Agreement to which Metavante cites states "[t]here are no restrictions, promises, warranties, covenants, or undertakings other than those expressly set forth herein and therein." (Hileman Decl., Ex. C, § 17.2, Docket #334). Metavante argues that the word "promises" encompasses representations. Since this term is not defined by the Agreement, the court is obliged to give the word "promise" its ordinary meaning. As the court described in its April 27, 2007 order, representations relate to present or pre-existing facts, not promises or predictions of the future state of affairs. (Order, April 27, 2007, 18, Docket #115) (citing Wisconsin cases). Section 17.2 of the Agreement does not explicitly disclaim representations made in relation to the Agreement. Therefore, the court finds that section 17.2 of the Agreement does not prevent Emigrant from proving it relied on Metavante's alleged misrepresentations of fact.

Metavante also argues that Emigrant cannot show reliance because weeks before executing the Agreement, Emigrant received advice from a third-party company called Core-Teck. Core-Teck assessed the Agreement as proposed and concluded that it was highly risky. Metavante asserts that this warning negates Emigrant's alleged reliance on any misrepresentations made by Metavante. Emigrant responds that Core-Teck was a project management vendor seeking to

-22-

market its services to Emigrant.  Emigrant asserts that Core-Teck provided only
general comments, and its alleged warnings at most raise a question of fact as to
whether Emigrant had notice of Metavante's alleged misrepresentations.  Emigrant
asserts that it was still in talks with Metavante and Metavante was still providing
assurances and perhaps even making additional representations after Core-Teck
made its recommendations.  The court finds that Core-Teck's advice to Emigrant
prior to execution of the Agreement may be relevant to the question of Emigrant's
reliance, but it does not resolve the question as a matter of law.  Therefore, a
genuine issue of material fact remains as to Emigrant's reliance, which precludes
summary judgment on the fraud in the inducement and intentional misrepresentation
claims.

### D. Rescission

Metavante asserts that Emigrant is not entitled to the remedy of rescission. Metavante argues that Emigrant waived its right to rescind the Agreement when it discovered alleged fraud in 2005, and later continued to embrace and invoke the Agreement. Emigrant responds that it did not discover Metavante's alleged fraud until 2006 after it received the benefit of discovery materials in this case. Upon discovery, Emigrant argues that it sought to rescind the Agreement within a reasonable time. Emigrant also notes that it first proposed terminating the Agreement and converting EmigrantDirect to an in-house system in November of 2005.

In Wisconsin, a party to a contract entered through fraud may choose between rescinding the contract or affirming the contract and seeking damages. *See Grube v. Daun*, 570 N.W.2d 851, 859 (Wis. 1997). This right to choose between remedies may be waived if a party "unreasonably delays in asserting [the] right or affirms the agreement after learning of the fraud. . . ." *Id.* (quoting *Thompson v. Village of Hales Corners*, 340 N.W.2d 704 (Wis. 1983). In its April 27, 2007 order, the court recognized rescission as a possible remedy for a breach of contract claim, but dismissed Emigrant's counterclaim for rescission as an independent claim. (Order, April 27, 2007, 25, Docket #115). Emigrant's remaining counterclaims of breach of contract, fraud in the inducement, intentional misrepresentation, and breach of fiduciary duty seek damages, not rescission. (Am. Answer & Countercl., Docket #84). The court considers Emigrant to have made its choice of remedies by virtue

of its pleading. Therefore, the court finds Metavante's argument with respect to Emigrant's right to rescission moot. Emigrant is no longer seeking rescission as a remedy for its breach of contract claim.

### E.    Comparing Metavante's System With Competitors

Metavante also makes the somewhat puzzling argument that "Emigrant has no misrepresentation claim based on the allegation that Metavante's system did not allow Emigrant to achieve its overall business purpose, or did not provide the same functionality as Metavante's competitors." (Supp. Br. 28, Docket #332). In support of this assertion, Metavante cites a proposed representation that ultimately was not included in the terms of the Agreement. The provision stated that Metavante was providing services "reasonably required for Customer to achieve its overall business purpose . . ." and that Metavante's services would "provide similar functionality, efficiency, capacity and reliability as those national online services currently offered by ING Direct . . . ." (PPFF ¶ 7). Emigrant responds that this provision is not dispositive because it did not end up in the Agreement. The court agrees that, although this prior iteration of the Agreement may be relevant in determining the issue of what representations were made prior to entering into the Agreement, it is not dispositive to Emigrant's counterclaims. Therefore, the court cannot conclude that Emigrant has not proven reliance as a matter of law, and the court denies Metavante's motion on the issue of reliance.

### 3.    Breach of Fiduciary Duty

Metavante next argues that it did not owe a fiduciary duty to Emigrant and, therefore, Emigrant's counterclaim for breach of fiduciary duty must be dismissed. Specifically, Metavante argues that the Agreement resulted from an arms-length transaction and no special relationship existed between the parties that would give rise to a fiduciary duty. Emigrant contends that it relied on Metavante for the operation of EmigrantDirect, and that Metavante "abused its superior position and breached its duty to Emigrant by withholding access to the customer data."

In its April 27, 2007 order, the court concluded, based on the pleadings, that it was conceivable a fiduciary relationship arose between Emigrant and Metavante. (Order, April 27, 2007, 24, Docket #115). The court noted Emigrant's allegations that Metavante controlled customer data gathered from EmigrantDirect and that Metavante allegedly withheld that data. The court now revisits the question of whether Metavante owed Emigrant a fiduciary duty.

As the court noted in its earlier order, fiduciary relationships may arise from the terms of a contract, or may be implied based on the factual circumstances surrounding a transaction and the parties to that transaction. *See Prod. Credit Ass'n of Lancaster v. Croft*, 423 N.W.2d 544, 547 (Wis. 1988). In *Croft*, the Wisconsin Supreme Court held that "manifest in the existence of a fiduciary relationship is that there exists an inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of facts involved, or other conditions giving to one an advantage over the other." *Id.* (citations omitted). The parties do not allege that the terms of the Agreement explicitly create a fiduciary relationship. Therefore, if

-26-

Emigrant were to recover for breach of fiduciary duty, the court would need to first imply that a fiduciary duty arose. A fiduciary relationship is implied "only when uneven bargaining power creates a relationship where the stronger party has a duty not to take advantage of the weaker party." *RxUSA, Inc. v. Capital Returns, Inc.*, No. 06-C-790, 2007 WL 2712958, at *10 (E.D.Wis. Sep. 14, 2007) (citing Wisconsin case law). Based on the facts presented to the court, the court declines to imply a fiduciary duty in this case.

Emigrant argues that a fiduciary duty was breached when Metavante withheld "final tapes" essential to EmigrantDirect's operation, as well as tapes containing customer information. (DPFF ¶¶ 110, 113). Emigrant also has put forth an affidavit of one of its IT executives stating that Metavante controlled EmigrantDirect customer data. (Scialabba Decl. ¶¶ 4-9, Docket #381). Another Emigrant employee states that Emigrant had virtually no access to Metavante's "proprietary material," including Metavante's source code. (DeMaio Decl. Ex. 86 ¶ 10-11, Docket #380). These facts do not establish a fiduciary duty. Emigrant is a bank with over $14 billion in combined assets, and is no doubt experienced in banking services. (Am. Answer & Countercl. ¶ 54, Docket #84). Similarly, Metavante is one of the nation's largest providers of transactional and processing services to financial institutions. (DPFF ¶¶ 1, 2, 4). The parties agree that the Agreement was negotiated over a period of months, with the parties exchanging drafts and proposed language. (PPFF ¶¶ 6-7). The court finds no evidence that either party had superior bargaining power over the other when entering into the Agreement.

If anything, Metavante's holding of customer information under the Agreement is more similar to a bailment relationship. A bailment is created by delivering possession of one party's property, the bailor, to another party, the bailee, for the benefit of the bailee, the bailor or both parties under a contract. *See Bushweiler v. Polk County Bank*, 384 N.W.2d 717, 718 (Wis.App.Ct. 1986). Under the Agreement, Metavante could be considered the bailee of Emigrant's customer information. Metavante held possession of the customer information for the benefit of both parties under the Agreement–Metavante gained the benefit of fees for its services and Emigrant gained the benefit of Metavante's services provided to EmigrantDirect customers. If Metavante wrongfully held customer information, this would amount to a breach of Metavante's duty to return the information and/or provide access to the information under the Agreement.

Because Emigrant has failed to demonstrate, after the benefit of discovery, that Metavante owed Emigrant a fiduciary duty, the court dismisses Emigrant's counterclaim for breach of fiduciary duty.

**4.    Breach of Contract**

In its motion, Metavante asserts that Emigrant's breach of contract claim must be dismissed because Metavante had no duty to provide a system comparable to competitors, Metavante had no duty to notify Emigrant of problems, and because the implied covenant of good faith does not create an independent duty. Emigrant responds that Metavante did not provide services under the Agreement in a commercially reasonable manner as the Agreement requires. Emigrant asserts that

Case 2:05-cv-01221-JPS    Filed 11/26/08    Page 28 of 37    Document 426

comparing services provided by Metavante's competitors is relevant to the question of commercial reasonableness. Emigrant further argues that a duty of good faith and fair dealing is implied in the Agreement, and that duty required Metavante to notify Emigrant when problems arose with the EmigrantDirect system.

The parties do not dispute that the Agreement creates no explicit duty obligating Metavante to deliver services comparable to Internet direct banking systems of competitors. However, Emigrant's contract claim does not rest on such a duty. Rather, Emigrant asserts that comparing other Internet banking systems, like that of ING Direct, to the system that Metavante delivered provides evidence that Metavante performed in a commercially unreasonable manner under the Agreement. Section 6.1 of the Agreement states that "Metavante warrants that it will provide all Services in a commercially reasonable manner in material conformance with the applicable Documentation and this Agreement (the "Performance Warranty"). . . ." (Hileman Decl., Ex. C, § 6.1, Docket #334). The court finds that, although Metavante had no explicit duty to deliver services comparable to other Internet direct banks, Metavante did have a duty to provide services under the Agreement in a commercially reasonable manner. Furthermore, because the parties did not define "commercially reasonable" in the Agreement, comparing direct banking systems of competitors in the same industry may shed light on its meaning.

Metavante also argues that a duty of good faith is not implied in the Agreement, and that the Agreement itself did not create a duty obligating Metavante to notify Emigrant of errors occurring in the EmigrantDirect system. However, under

Case 2:05-cv-01221-JPS    Filed 11/26/08    Page 29 of 37    Document 426

Wisconsin law, "every contract implies good faith and fair dealing between the parties to it, and a duty of cooperation on the part of the parties." *First Bank & Trust v. Firstar Info. Serv., Corp.*, 276 F.3d 317, 325 n.10 (7th Cir. 2001) (quoting *Wis. Natural Gas Co. v. Gabe's Constr. Co.*, 582 N.W.2d 118, 121 (Wis.App.Ct. 1998)). While it is true that the duty of good faith is grounded in the terms of the contract to which the parties agreed, "compliance in form, not in substance" may constitute a breach of the covenant of good faith. *Bozzacchi v. O'Malley*, 566 N.W.2d 494, 495 (Wis. 1997); *see also Didion Milling, Inc. v. Agro Distrib., LLC*, No. 05-C-227, 2007 WL 702808, at *15 (E.D.Wis. March 2, 2007).

The parties continue to dispute the nature and underlying causes of the EmigrantDirect system's errors and the frequency of those errors. Viewing the evidence presented to the court in a light most favorable to Emigrant, the court concludes that Emigrant has stated a claim for breach of contract based in part on the implied covenant of good faith and fair dealing. Depending on the nature and extent of the errors the EmigrantDirect system suffered, Metavante may have had a duty to minimize future errors by disclosing more information to Emigrant. *See generally Uebelacker v. Paula Allen Holdings, Inc.*, 464 F.Supp.2d 791, 803-04 (W.D.Wis. 2006) (holding implied duty of good faith could require "reasonable efforts to minimize the risk of errors" in performance under a contract). In sum, the court finds that Metavante is not entitled to judgment as a matter of law on Emigrant's breach of contract counterclaim. Therefore, the court denies Metavante's motion with respect to this claim.

**5.    Motions to Seal**

Finally, the court addresses four motions to seal documents that remain outstanding in relation to Metavante's motion for summary judgment.

First, Metavante moves to seal twenty-three exhibits filed in support of its motion for summary judgment. (Docket #336).   Metavante claims that these documents contain trade secrets, and non-public financial or business information protected by the court's May 14, 2007 order.   However, Metavante later filed a motion to unseal four of these exhibits. (Docket #393). After review of the remaining documents Metavante referenced in the motion, the court finds that many of these documents do not fall within the court's protective order.   Because of the number of exhibits submitted, the court will specifically identify only those documents not entitled to protection.

Exhibit D is a ninety page portion of a deposition of Eileen Lyon.   The document contains testimony on the course of negotiations between Emigrant and Metavante leading up to the Agreement.   Much of this information was disclosed in the parties' briefs and proposed findings of fact, and the court can find no basis to seal it.  Exhibit E is a transcript portion of another deposition of Eileen Lyon, in which Ms. Lyon testifies in general terms about internal discussions during contract negotiations.   Again, the court finds no basis to seal this document.   Exhibit F is a copy of a non-final copy of the Agreement with several mark-ups.  The Agreement is not sealed, and the mark-ups on Exhibit F are few and do not reveal any trade secrets, or non-public personal, financial or business information protected under the

-31-

court's order. Exhibit H is an email from Emigrant's counsel to Metavante with an attachment of proposed changes to the Agreement. The court again finds no basis to seal this information as it does not appear to reveal any non-public information. Exhibit I is a copy of Metavante's response to Emigrant's suggested amendments to the Agreement. This document contains suggested changes to the proposed contract. It contains no strategy or even reasoning for proposing the amendments. Exhibit J is a marked-up copy of Exhibit I. The document contains hand-written mark-ups. The court's protective order does not cover this information. These mark-ups reveal no non-public information other than the fact that the parties exchanged proposed language before entering into the contract. However, this fact has been disclosed by the parties in multiple public filings. Exhibits K and L are excerpts from a transcript of a deposition of Ted Morehouse. Exhibit K refers to Emigrant's dealings with Core-Teck, which Emigrant already describes in its unsealed brief, and the court finds no basis to seal it. In Exhibit L, however, Morehouse describes how the call center for EmigrantDirect worked. The court considers this to be non-public information speaking to business strategy and finds grounds to seal it. Exhibits O and P are portions of Howard Milstein's deposition transcript. The information conveyed in these excerpts relate to Mr. Milstein's opinion of Metavante's performance, and some information on the correspondence sent between the parties. This is by no means confidential, and the information conveyed in these documents mirrors much of Emigrant's substantive arguments. The court finds no basis to seal these exhibits. Exhibit V contains deposition

testimony of Kimberly Romano which discusses problems experienced in the EmigrantDirect system. The problems referenced have been discussed in depth in the parties public filings and the court finds no basis to seal this exhibit. Exhibit GG is a copy of the report from Paul Pocalyko, and Exhibit HH is an excerpt of Mr. Pocalyko's depositions. Exhibit GG contains non-public financial information, but Exhibit HH discusses only Mr. Pocalyko's methodology in making his damage estimates. The court will seal Exhibit GG but not Exhibit HH. Therefore, with respect to Metavante's motion (Docket #336), the court grants the motion with respect to Exhibits G, L, M, N, Q, S and GG only.

Metavante also moved to unseal certain exhibits that the parties have agreed to unseal. Finding no independent basis to seal these documents, the court grants Metavante's motion (Docket #393) to unseal Exhibits W, Y, Z, AA, CC, JJ, KK and LL.

Emigrant moves to seal eighty different documents filed with the court. (Docket #402). After reviewing the materials filed, the court finds that the vast majority of the information contained in these documents relates directly to Metavante's business strategies, trade secrets involving the architecture of its technology systems, and financial information outlining costs and pricing of its services. Because the sheer number of documents Emigrant requests to be sealed, the court will list only those exhibits it has found do not fall within the court's protective order. Exhibit 73 is a copy of an email between Emigrant and Metavante discussing volume and capacity issues with EmigrantDirect in a general way. This

information has been disclosed in the parties' open filings, and the court finds no basis to seal it. Emigrant also filed several excerpts of transcripts that were not numbered. The court finds that the following excerpts do not contain either trade secrets, non-public person, business or financial information: The August 26, 2008 deposition of Howard Milstein; the August 26, 2008 deposition of Gary Refinski; the May 8, 2008 deposition of Louise Roepke; the August 5, 2008 deposition of Gregg Schneider; and the July 23, 2008 deposition of Susan Sternhagen. Therefore, with respect to Emigrant's motion (Docket #402), the court denies the motion as to Exhibits 73, and the excerpts of deposition transcripts listed above, and grants the motion as to the remaining documents.

Metavante also moved to seal nine additional documents. (Docket #416). The court again specifically cites only those documents it finds not to fall under the court's protective order. Exhibit MM is an excerpt of Frank Martire's deposition transcript. The questions and answers discuss, only in very general terms, a memory error that occurred on the Metavante system. Again, the parties have discussed in depth, and disclosed in public filings, the errors that occurred in the Metavante system. The court finds no basis to seal Exhibit MM. Exhibit TT is a one page excerpt of Ted Morehouse's deposition transcript referring to another person's recommendation of Core-Teck's services. The court finds no basis to seal this exhibit. Similarly, the court finds that Exhibit UU, an excerpt from Dennis Paschke's deposition transcript, contains no protected information. Therefore, with respect to Metavante's motion (Docket #393), the court denies the motion as to Exhibits MM, TT and UU, and grants the motion for the remaining documents described in the motion.

The court notes that any party or interested member of the public can challenge the sealing of any of the documents sealed pursuant to this order under paragraph 12 of the court's protective order. (Order May 14, 2007, Docket #125).

Accordingly,

**IT IS ORDERED** that Metavante's motion for summary judgment (Docket #331) be and the same is hereby **GRANTED** in part, and **DENIED** in part; Emigrant is not entitled to rescission of the Agreement, or consequential or punitive damages on its counterclaims;

**IT IS FURTHER ORDERED** that Emigrant's Fifth Claim For Relief for breach of fiduciary duty be and the same is hereby **DISMISSED** with prejudice;

**IT IS FURTHER ORDERED** that Metavante's motion to seal documents (Docket #336) be and the same is hereby **GRANTED** in part and **DENIED** in part; Metavante is hereby granted leave to file under seal Exhibits G, L, M, N, Q, S and GG; the clerk of the court shall place in an open file Exhibits D, E, F, H, I, J, K, O, P, V, W, Y, Z, AA, CC and HH;

**IT IS FURTHER ORDERED** that Metavante's motion to unseal documents (Docket #393) be and the same is hereby **GRANTED**; the clerk of the court shall place in an open file Exhibits W, Y, Z, AA, CC, JJ, KK and LL;

**IT IS FURTHER ORDERED** that Emigrant's motion to seal documents (Docket #402) be and the same is hereby **GRANTED** in part and **DENIED** in part: Emigrant is hereby granted leave to file under seal all exhibits listed in its motion except for Exhibit 73 and the excerpts of transcripts described above; the clerk of the court shall place in an open file Exhibit 73, and excerpts of transcripts described above.

**IT IS FURTHER ORDERED** that Metavante's motion to seal documents (Docket #416) be and the same is hereby **GRANTED** in part and **DENIED** in part; Metavante is hereby granted leave to file under seal Exhibits OO, PP, SS, WW, XX and YY; the clerk of the court shall place in open file Exhibits MM, TT and UU.

Dated at Milwaukee, Wisconsin, this 26th day of November, 2008.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge